IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>vs.<br><br>JOHNNIE B. DAVIS, JR.,<br><br>    Defendant. | 8:13CR85<br><br>FINDINGS AND<br>RECOMMENDATION |

This matter is before the court on the motion to suppress (Filing No. 14) filed by defendant Johnnie B. Davis, Jr. (Davis). Davis is charged in the Indictment with the knowing possession of a firearm after having been convicted of a crime punishable by imprisonment for a term exceeding one year (Count I) in violation of 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(a)(2). See Filing No. 1. Davis seeks to suppress evidence seized from his home and all statements obtained by Omaha Police Department (OPD) officers on January 1, 2013.

The court held a hearing on the motion on May 2, 2013. Davis was represented by his counsel, Federal Public Defender David R. Stickman. The United States was represented by Special Assistant U.S. Attorney Martin J. Conboy, IV. The court heard the testimony of OPD Officers Brian Schuster (Officer Schuster) and Brandon Hahn (Officer Hahn). The court also received in evidence an OPD Permission to Search Form (Exhibit 1) and an OPD Patrol Car Video DVD (Exhibit 2). A Transcript (TR.) of the hearing was filed on May 9, 2013, at which time the matter was deemed submitted. See Filing No. 23.

FINDINGS OF FACT

At approximately 7:00 p.m. on January 1, 2013, Officer Schuster, a police officer for seven years, responded to a call regarding an armed disturbance on 38th and Fort Streets (TR. 4, 22). Officer Schuster was advised an individual had a shotgun and was arguing inside the house (TR. 12). Upon arriving at the scene, Officer Schuster and his partner, Officer Corey Clements (Officer Clements), noted the garage door was open and heard individuals yelling in argument (TR. 4, 10). Officers Schuster and Clements

announced themselves as Omaha Police at the open garage door (TR. 4). In response, Gwendolyn Davis-White (Davis-White), Davis' mother, came to the garage door and informed the officers that Davis was inside the home armed with a shotgun (TR. 4-5). The officers announced their presence a second time, at which point Davis himself came to the garage door and the officers placed him in handcuffs (TR. 5).

Officer Schuster took Davis to his patrol car and detained Davis out of concern for the safety of Davis and others (TR. 6). Officer Schuster asked Davis his name, date of birth, and if he lived at the Fort Street residence (TR. 6-7). Officer Schuster ran a data check to see if Davis had any outstanding warrants (TR. 5-7, 9). During Davis' detention, Officer Schuster periodically stood outside of the patrol car to speak with other officers on scene (TR. 17). Officer Schuster and the other officers discussed whether Davis would be placed in emergency protective custody to prevent him from hurting himself and others (TR. 17). Officer Schuster also discussed whether the officers would be getting a search warrant for the house, and if a bolt cutter would need to be used on the padlocked door leading to a basement room (TR. 37).

Officer Hahn, a police officer of almost five years, arrived with his partner, Officer Wiley, at the scene approximately one minute after Officer Schuster (TR. 22). He parked his patrol car across the street facing Officer Schuster's patrol car (TR. 13). Officer Hahn's patrol car was equipped with an audio and video recording device that starts and stops respective to the patrol car's lights and siren being on or off (TR. 41). Officer Schuster's patrol car did not have an audio-video recording device (TR. 12). Officer Hahn's patrol car recorded the discussions between Officer Schuster and the other officers regarding emergency protective custody (TR. 32).

While Officer Schuster detained Davis in the patrol car, Officer Hahn and his partner conducted a protective sweep of the house (TR. 22). They secured the two other residents, Davis-White and Billy White (White), Davis' step-father (TR. 22). Davis-White told Officer Hahn that Davis had brandished a shotgun and made statements threatening to shoot himself (TR. 23). Officer Hahn testified White told him that Davis had "racked" the pump action shotgun, i.e. pulled the slide on the shotgun as to put a shell into the chamber, and stated he was going to "blow his head off" (TR. 23, 40). The officers asked White if there were any firearms in the house (TR. 23). White stated he

2

possessed two firearms (TR. 24). White relinquished the firearms to the officers for safekeeping and signed a Permission to Search form for the officers to search the house (TR. 23-24). The officers searched the house with the exception of the room identified as Davis' room (TR. 24). The gun with which Davis had threatened to harm himself with was not recovered (TR. 24).

After searching the house, Officer Hahn asked Davis about his mental health to determine whether to place Davis in emergency protective custody (TR. 25). Davis stated he was not going to harm himself, he wanted the police officers to leave, and he intended to leave and spend the night at another location (TR. 36). Officer Hahn asked Davis if he would give consent to search his room, which was located in the basement with a padlocked door, as there was one firearm unaccounted for and the officers were concerned Davis may use it to harm himself (TR. 25). Officer Hahn told Davis to "think about it for a minute" (TR. 25). Davis did not respond (TR. 25). Officers Hahn and Schuster told Davis he could consent to search or they would apply for a search warrant (TR. 26). Davis told Officer Schuster there were a total of three guns in the house, two the officers had recovered and a third unrecovered gun belonging to Davis (TR. 26).

Officer Schuster told Officer Hahn about Davis' statement (TR. 26). Officer Hahn approached Davis again to ask for consent, and at approximately 7:50 p.m., Davis agreed to sign a Permission to Search form and offered to take the police to the location of the third gun (TR. 27). They made no threats or promises regarding the search (TR. 28). None of the officers had their weapons drawn (TR. 28). Officer Hahn testified Davis was lucid and did not appear to be under the influence of drugs or alcohol (TR. 27). After securing permission to search, one of the other officers informed Officer Hahn Davis was a convicted felon (TR. 29). Davis accompanied the officers to his bedroom, where they removed the padlock by unscrewing the clasp from the wall with a multitool (TR. 27). This was necessary, as the keys to the padlock were locked inside of the room itself (TR. 37). Davis directed officers to a utility closet where officers found the third gun (TR. 27). Subsequently, the officers transported Davis to the station for booking (TR. 8). Davis was not given *Miranda* warnings at any point (TR. 40).

Shortly before Davis signed the Permission to Search form, Officer Wiley returned to his patrol car and deactivated the lights and sirens before moving it, which

3

deactivated the recording device and created a lapse in the tape from 7:41 p.m. to 8:14 p.m. (TR. 16, 41). The search was not captured on video (TR. 16). The recording started again when Davis was transported back to police headquarters, in accordance with the standard operating procedure of the OPD to record all prisoner transports (TR. 39).

## LEGAL ANALYSIS

Davis argues evidence found in his bedroom and statements he made should be suppressed because (1) no probable cause existed for his detention, (2) no *Miranda* warnings were given prior to questioning, and (3) no warrant or valid consent authorized the search. **See** Filing No. 15.

### A.   Probable Cause for Detention

Davis argues his detention was unsupported by probable cause. The Constitution provides "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Investigative detentions are seizures of limited scope and duration within the meaning of the Fourth Amendment and must be supported by a reasonable articulable suspicion of criminal activity. **See, e.g.,** *United States v. Sokolow*, 490 U.S. 1 (1989); *Reid v. Georgia*, 448 U.S. 438 (1980); *Terry v. Ohio*, 392 U.S. 1 (1968); *United States v. Griffith*, 533 F.3d 979, 983-84 (8th Cir. 2008); *United States v. Saenz*, 474 F.3d 1132, 1136 (8th Cir. 2007). To determine whether the requisite degree of suspicion exists, the court examines "whether the facts collectively establish reasonable suspicion, not whether each particular fact establishes reasonable suspicion." *United States v. Beck*, 140 F.3d 1129, 1136 (8th Cir. 1998). "Whether the particular facts known to the officer amount to an objective and particularized basis for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Maltais*, 403 F.3d 550, 555 (8th Cir. 2005) (**quoting** *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir. 1994)). "In forming a basis for suspicion, officers may draw on their own experience and specialized training to make inferences from and

deductions about the cumulative information available to them." *Maltais*, 403 F.3d at 555 (8th Cir. 2005) (internal quotations omitted).

The scope of an investigatory detention "must be carefully tailored to its underlying justification." *United States v. Bell*, 480 F.3d 860, 864 (8th Cir. 2007). Courts must consider "the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate these purposes" and it must "last no longer than is necessary to effectuate the purpose of the stop." *United States v. Mendoza*, 677 F.3d 822, 828 (8th Cir. 2012) (**quoting** *United States v. Bloomfield*, 40 F.3d 910, 917 (8th Cir. 1994). In responding to threatening situations "police officers may handcuff a suspect and place him in a patrol car during an investigative stop in order to protect their personal safety and maintain the status quo." *United States v. Robinson*, 670 F.3d 874, 877 (8th Cir. 2012). Courts have routinely held "when officers are presented with serious danger in the course of carrying out an investigative detention, they may brandish weapons or even constrain the suspect with handcuffs in order to control the scene and protect their safety." *United States v. Smith*, 648 F.3d 654, 659 (8th Cir. 2011) (**quoting** *United States v. Fisher*, 364 F.3d 970, 973 (8th Cir. 2004). Handcuffing a suspect during an investigatory detention to protect the safety of the officer and others can be a "reasonable precaution in light of the dangerous nature of the suspected crime." *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011).

Here the officers had a reasonable articulable suspicion to believe Davis was armed and dangerous. The officers were responding to a call regarding an armed disturbance. When they arrived they heard shouts coming from within the house. After announcing their presence, Davis' mother exited the house and informed the officers Davis was inside and armed with a shotgun. When Davis came to the door he was immediately handcuffed and detained out of a reasonable concern he may attempt to harm himself while officers investigated the situation. The location of the shotgun Davis could potentially harm himself with was unknown, necessitating Davis' detention and an investigation of the situation.

The officers detained Davis in the patrol car as long as it took for law enforcement to secure the premises, complete their investigation, and conduct a search for weapons. Davis remained in the patrol car until officers requested his consent to

search his locked bedroom for the remaining firearm. Davis suffered no constitutional violation. The officers had a reasonable articulable suspicion to detain Davis, and his detention was reasonable in length.

**B.    *Miranda* Warnings**

Davis seeks to suppress statements he made to officers during his detention. He argues officers subjected him to a custodial interrogation without providing him *Miranda* warnings. The Self-Incrimination Clause of the Fifth Amendment provides no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. Law enforcement must advise a suspect of their right to remain silent, anything they say can be used against them, their right to an attorney, and one will be provided if they cannot afford one. *United States v. Miranda*, 384 U.S. 436, 483 (1966). The requirements of *Miranda* arise only when a defendant is subject to a custodial interrogation. *United States v. Sanchez*, 676 F.3d 627, 630 (8th Cir. 2012). Custodial interrogation is defined as "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *United States v. Boslau*, 632 F.3d 422, 427 (8th Cir. 2011) (quoting *Miranda*, 384 U.S. 436, 444 (1966)).

"Custody is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 132 S.Ct. 1181, 1189 (2012) (internal marks omitted). The court must evaluate the objective circumstances surrounding the interrogation, and whether, under those circumstances, "a reasonable person would have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995); *Stansbury v. California*, 511 U.S. 318, 322-23 (1994) (based "on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.").

The Eighth Circuit suggests several nonexclusive factors to evaluate whether the atmosphere of police questioning was custodial:

> 1) whether the suspect was informed at the time of questioning that the questioning was voluntary, that the suspect was free to leave or request the officers to do so, or that the suspect was not considered under arrest;

6

>(2) whether the suspect possessed unrestrained freedom of movement during questioning; (3) whether the suspect initiated contact with authorities or voluntarily acquiesced to official requests to respond to questions; (4) whether strong arm tactics or deceptive stratagems were employed during questioning; (5) whether the atmosphere of the questioning was police dominated; or, (6) whether the suspect was placed under arrest at the termination of the questioning.

*Sanchez*, 676 F.3d at 630 (**quoting** *United States v. Griffin*, 922 F.2d 1343, 1349 (8th Cir. 1990)). Application of these factors is not mechanical and the issue of whether an individual is in custody "cannot be resolved merely by counting up the number of factors on each side of the balance and rendering a decision accordingly." *United States v. Czichrary*, 378 F.3d 822, 827-28 (8th Cir. 2004). From this principal it follows the presence or absence of any one factor is not determinative on the issue. *Griffin*, 922 F.2d at 1347. Instead, a court must "examine the extent of the physical or psychological restraints placed on the suspect during interrogation in light of whether a 'reasonable person in the suspect's position would have understood his situation' to be one of custody." *Id.* (**quoting** *Berkemer v. McCarty*, 468 U.S. 420, 440 (1984)).

Interrogation encompasses "only words or actions on the part of police officers that they *should have known* were reasonably likely to elicit incriminating response." *United States v. Orr*, 636 F.3d 944, 954 (8th Cir. 2011) (**quoting** *Rhode Island v. Innis*, 446 U.S. 291, 302 (1979) (emphasis in original). This does not include words "normally attendant to arrest and custody." *United States v. Hernandez-Mendoza*, 600 F.3d 971, 976-77 (8th Cir. 2010) (**quoting** *Innis*, 446 U.S. at 301). Thus, not all police inquiries requiring Miranda warnings. *United States v. Cowan* 674 F.3d 947, 958 (8th Cir. 2012); *United States v. McLaughlin*, 777 F.2d 388, 391 (8th Cir. 1985) (finding questions of address, telephone number, and basic identifying factors did not require ***Miranda*** warnings). Further, statements "given freely and voluntarily without any compelling influences [are], of course, admissible in evidence." *Miranda*, 384 U.S. at 478. Whether a statement is voluntary is determined by a totality of the circumstances, including:

>the characteristics of the accused and the details of the interrogation . . . the youth of the accused, his lack of education, or his low intelligence, the lack of any advice to the accused of his constitutional rights, the length of

7

> detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep.

*Houston v. Lockhart*, 866 F.2d 264, 266 (8th Cir. 1989) (**quoting** *Hall v. Wolff*, 539 F.2d 1146, 1150-51 (8th Cir. 1976)).

> Not every confession obtained absent the *Miranda* warnings is inadmissible, however, because "police officers are not required to administer *Miranda* warnings to everyone whom they question. *Miranda* warnings are required only where there has been such a restriction on a person's freedom as to render him 'in custody.' It was that sort of coercive environment to which *Miranda* by its terms was made applicable, and to which it is limited.

*United States v. LeBrun*, 363 F.3d 715, 720 (8th Cir. 2004) (**quoting** *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977)).

When the officers handcuffed Davis and placed him in the patrol car, Davis was in custody. However, the officers' questions were not sufficient to constitute an "interrogation" for the purposes of *Miranda*. Davis' initial statement regarding his name, date of birth, and place of residence are all questions normally attendant to arrest or custody. See *Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990) (holding questions regarding "address, height, weight, eye color, date of birth, and current age do not qualify as custodial interrogation . . . because the questions were not intended to elicit information for investigatory purposes"). When Davis stated he was not going to harm himself, he wanted police to leave, and he intended to spend the night at another location, he was responding to Officer Hahn's questions to establish his mental state. Additionally, with regard to Davis' statement he had a firearm, at the time Officer Schuster asked Davis about the firearm, Officer Schuster was unaware Davis was a convicted felon. Therefore Officer Schuster did not know his question was likely to elicit an incriminating response. Instead, Officer Schuster's question was motivated to secure the scene and Davis' safety. Although Davis was in custody, the officers did not interrogate Davis. His statements, made absent *Miranda* warnings, are admissible.

C.  **Consent to Search**

Davis argues his consent to search was not voluntary and therefore evidence obtained in the search must be suppressed. The Constitution provides "the right of the

8

people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "It is a cardinal principal that searches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *United States v. Farnell*, 701 F.3d 256, 261 (8th Cir. 2012) (**quoting** *Mincey v. Arizona*, 437 U.S. 385, 390 (1978)) (internal quotations omitted). "Consent is one exception to the warrant requirement." *Id*. at 262. Consent may be given "if, in the totality of the circumstances, consent is freely and voluntarily given, and not the product of implicit or explicit coercion." *Id*. at 263 (**quoting** *United States v. Castellanos*, 518 F.3d 965, 969 (8th Cir. 2008)).

The government bears the burden of proving consent was voluntary by a preponderance of the evidence. *Saenz,* 474 F.3d at 1137. Whether "consent to a search was in fact voluntary is . . . determined from the totality of the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). "This burden is not satisfied by showing a mere submission to a claim of lawful authority. Rather, the government must show a reasonable person would have believed that the subject of a search gave consent that was the product of an essentially free and unrestrained choice." *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004) (internal citations and quotations omitted). "In order for a consensual search to be valid, consent must actually be given (either express or implied), and the person giving consent must have (actual or apparent) authority to do so." *United States v. Williams*, 521 F.3d 902, 906 (8th Cir. 2008). The question is not whether a defendant subjectively consented, "but rather, whether a reasonable officer would believe consent was given." *United States v. Correa*, 641 F.3d 961, 967 (8th Cir. 2011).

Four factors are considered when determining whether a reasonable officer would believe consent was voluntary: "(1) the individual's age and mental ability; (2) whether the individual was intoxicated or under the influence of drugs; (3) whether the individual was informed of [his] *Miranda* rights; and (4) whether the individual was aware, through prior experience, of the protections that the legal system provides for suspected criminals." *United States v. Dunning*, 666 F.3d 1158, 1165 (8th Cir. 2012) (**quoting** *United States v. Quintero*, 648 F.3d 660, 667 (8th Cir. 2011)). Additionally,

9

the court may look to the overall atmosphere in which consent was given, including: length of detention; the use of threats, intimidation, or punishment by police; the use of promises or misrepresentations by police; whether the individual was in custody or under arrest at the time of consent; whether the individual was in a public or secluded place when consent was given; and whether the individual stood by silently or objected to the search. *Id.* Whether a suspect has been given *Miranda* warnings is considered, but is not required, in determining valid consent, and "an absence of *Miranda* warnings would [not] make an otherwise voluntary consent involuntary." *United States v. Beasley*, 688 F.3d 523, 531 (8th Cir. 2012) (**quoting** *Saenz*, 474 F.3d at 1137).

The facts indicate consent was voluntary. After explaining the scope and purpose of the search, Officer Hahn told Davis he could "think about it for a minute" and walked away. Davis was again approached and asked if he would consent to the search, which he did. The officers testified he did not appear to be under the influence of drugs or alcohol. No threats or promises were made by the officers and none of the officers had their weapons drawn while asking for consent. The environment in which consent was given and in which the search took place shows voluntary consent. Davis was in custody in a patrol car for only thirty to forty minutes, which was reasonable. The officers knew Davis possessed actual authority to give consent. Davis signed a Permission to Search form and volunteered to lead the officers directly to the firearm. At no point did he subsequently object to the search. A rational inference from the totality of the circumstances would lead officers on scene to reasonably believe Davis' consent was voluntary. Accordingly, Davis' motion to suppress evidence obtained from a search conducted with his consent should be denied. Upon consideration,

**IT IS RECOMMENDED TO JUDGE JOSEPH F. BATAILLON that:**

Davis' motion to suppress (Filing No. 14) be denied.

## ADMONITION

Pursuant to NECrimR 59.2 any objection to this Findings and Recommendation shall be filed with the Clerk of the Court within ten (10) business days after being served with a copy of this Findings and Recommendation. Failure to timely object may

constitute a waiver of any objection.  The brief in support of any objection shall be filed at the time of filing such objection.  Failure to file a brief in support of any objection may be deemed an abandonment of the objection.

Dated this 24th day of May, 2013.

BY THE COURT:

 s/ Thomas D. Thalken
United States Magistrate Judge